533 So.2d 1226 (1988)
Malcolm SUTTER, II
v.
AUDUBON PARK COMMISSION, et al.
No. CA-8684.
Court of Appeal of Louisiana, Fourth Circuit.
June 7, 1988.
Rehearing Denied December 14, 1988.
*1227 Frank J. D'Amico, Vincent J. Glorioso, Jr., Ronald A. Welcker, Dennis J. Phayer, Glorioso, Welcker & Zaunbrecher, New Orleans, for plaintiff-appellee Malcom Sutter, II.
William A. Porteous, III, John J. Hainkel, Jr., Michael K. Fitzpatrick, Porteous, Hainkel, Johnson & Sarpy, New Orleans, and Richard B. Nevils, Baton Rouge, for defendant-appellant Audubon Park Com'n and Southeastern Fidelity Ins. Co.
William J. Guste, Jr., Atty. Gen., Kendall L. Vick, Asst. Atty. Gen., New Orleans, for State of La., amicus curiae.
*1228 Okla Jones, II, City Atty., New Orleans, for City of New Orleans, amicus curiae.
Frank J. Stich, Jr., Sessions, Fishman, Rosenson, Boisfontaine Nathan & Winn, New Orleans, for New Orleans City Park Improvement Assoc., amicus curiae.
Before SCHOTT, KLEES and WILLIAMS, JJ.
KLEES, Judge.
On October 1, 1981, plaintiff Malcolm Sutter was shot by an unknown assailant in a restroom facility of Audubon Park and rendered a paraplegic. He sued the Audubon Park Commission, and one of its insurers, Southeastern Fidelity Insurance Company, as well as the city of New Orleans and the state of Louisiana, alleging that their negligence was a legal cause of his shooting.
The state of Louisiana was dismissed as a defendant prior to trial on the basis that the city of New Orleans is the owner of Audubon Park. The case was tried against the remaining defendants in December of 1986. At the conclusion of the plaintiff's case, the trial judge dismissed the city of New Orleans on the grounds that plaintiff had not shown any right to relief against it, pursuant to Louisiana Code of Civil Procedure article 1672. This dismissal has not been appealed. At the end of trial, the court found the Audubon Park Commission and its insurer liable to the plaintiff in the amount of $4,210,282.53. Defendants now appeal that judgment.
Audubon Park, which contains approximately four hundred acres, is located in a highly populated residential area of New Orleans near two major universities. The park is bounded by Walnut Street, Exposition Boulevard, St. Charles Avenue, and the Mississippi River. Magazine Street, a main traffic artery of the city, runs through the park from beyond Exposition to Walnut, dividing it roughly in half. The area of the park between Magazine Street and the river, which contains the zoo, is referred to as the "back part"; whereas, the area between Magazine and St. Charles Avenue is known as the "front part." The front part contains the lagoon, bandstand, golf course, open recreation areas and several shelter houses, including Shelter No. 12, where Mr. Sutter was assaulted.
Shelter No. 12, which contains a restroom facility, is located about fifty feet from Walnut Street and about one hundred fifty feet from West Drive, the nearest interior park roadway. There is a paved walkway connecting Shelter No. 12 to the sidewalk on Walnut. On the day in question, plaintiff Sutter developed the need of a restroom while driving down Magazine Street at about 3:00 in the afternoon, after having visited a sick friend. As a frequent park user, Mr. Sutter was familiar with the location of the restrooms. He therefore turned on Walnut Street, parked his car, and walked to Shelter No. 12. Inside the restroom, he was confronted by an unknown gunman who first demanded his wallet and then shot Sutter in the chest before Sutter could comply with the demand. At the time of the shooting, Mr. Sutter was fifty-six years old, divorced and the father of two grown children. A veteran of both World War II and the Korean War, Mr. Sutter had been employed for fourteen years by Woodward, Wight and Company, Ltd., as manager of the Returned Goods Department at a salary of $1,100.00 per month. The shooting left him a paraplegic, causing a complete loss of sensory, neurological, and motor functions below his nipple area.
The entity which has custody and control of Audubon Park is the Audubon Park Commission. The Commission operates the park and has enacted rules and regulations concerning the use of park grounds and facilities. Sometime in the 1960's, the Commission decided to have constructed throughout the park several concrete structures housing restroom facilities, among which is Shelter No. 12. The Commission also maintains (and had maintained since well prior to 1981) a staff of security persons to enforce park regulations, provide information to visitors, and protect park property and visitors.
Much of the trial testimony focused upon this security staff and its performance.
*1229 After hearing all the evidence, the trial judge decided that the Audubon Park Commission had a duty to provide adequate security to the plaintiff, which duty was breached, and that the breach was a legal cause of plaintiff's injury. The court also held that the Commission is not immune from liability to the plaintiff by virtue of La.R.S. 9:2795, which grants such immunity to owners of "property used primarily for recreational purposes."
On appeal, the Commission raises three alternative arguments: (1) the trial court erred in holding that R.S. 9:2795 does not apply to this case; (2) the trial court erred in finding the Commission liable for plaintiff's shooting; and (3) The trial court erred in awarding excessive damages.
I. Immunity
R.S. 9:2795 states:
§ 2795. Limitation of liability of landowner of property used for recreational purposes; property owned by the Department of Wildlife and Fisheries
A. As used in this Section:
(1) "Land" means land, roads, water, watercourses, private ways and buildings, structures, and machinery or equipment when attached to the realty.
(2) "Owner" means the possessor of a fee interest, a tenant, lessee, occupant or person in control of the premises.
(3) "Recreational purposes" includes, but is not limited to, any of the following, or any combination thereof: hunting, fishing, trapping, swimming, boating, camping, picniking, hiking, horseback riding, bicycle riding, motorized vehicle operation for recreation purposes, nature study, water skiing, ice skating, sledding, snow mobiling, snow skiing, summer and winter sports, and viewing or enjoying historical, archaeological, scenic, or scientific sites.
(4) "Charge" means the admission price or fee asked in return for permission to use lands.
(5) "Person" means individuals regardless of age.
B. (1) Except for willful or malicious failure to warn against a dangerous condition, use, structure, or activity, an owner of land, except an owner of commercial recreational developments or facilities, who permits with or without charge any person to use his land for recreational purposes as herein defined does not thereby:
(a) Extend any assurance that the premises are safe for any purposes.
(b) Constitute such person the legal status of an invitee or licensee to whom a duty of care is owed.
(c) Incur liability for any injury to person or property incurred by such person.
(2) The provisions of this Subsection shall apply to owners of commercial recreational developments or facilities for injury to persons or property arising out of the commercial recreational activity permitted at the recreational development or facility that occurs on land which does not comprise the commercial recreational development or facility and over which the owner has no control when the recreational activity commences, occurs, or terminates on the commercial recreational development or facility.
C. Unless otherwise agreed in writing, the provisions of Subsection B shall be deemed applicable to the duties and liability of an owner of land leased for recreational purposes to the federal government or any state or political subdivision thereof or private persons.
D. Nothing in this Section shall be construed to relieve any person using the land of another for recreational purposes from any obligation which he may have in the absence of this Section to exercise care in this use of such land and in his activities thereon, or from the legal consequences of failure to employ such care.
E. The limitation of liability provided in this Section shall apply to any lands or waterbottoms owned, leased, or managed by the Department of Wildlife and Fisheries, regardless of the purposes for which the land or waterbottoms are used, and whether they are used for recreational or nonrecreational purposes.
*1230 Defendants contend that the trial court should have granted immunity under the statute because Audubon Park is an area used for recreational purposes, including many of the activities listed in 2795(A)(3). This argument ignores the fact that our state Supreme Court, in interpreting the statute, has recently limited the definition of "recreational purposes" to conform to what the Court views as the legislative intent. In Keelen v. State, 463 So.2d 1287 (La.1985), the Court held that the statute afforded no immunity to the state against a wrongful death action arising out of a drowning that occurred in a swimming pool in Fountainbleau State Park. In that case, noting that the purpose of the statute is "to encourage owners of land to make land and water areas available to the public for recreational purposes" (See 1975 La.Acts, No. 615, § 1), the Court found that the law conferred immunity only upon owners of "undeveloped, nonresidential rural or semirural land areas." 463 So.2d at 1290. Furthermore, the Court stated that the characteristics of the land alone do not determine whether the statute applies; the injurycausing condition or instrumentality must also be scrutinized. In this regard, the Court stated:
"When the injury-causing condition or instrumentality is of the type normally encountered in the true outdoors, then the statutes provide immunity. Conversely, when the instrumentality, whether found in an urban or rural locale, is of the type usually found in someone's backyard, then the statutes afford no protection."
Id. at 1290 (footnote omitted).
Several months after deciding Keelen, the Supreme Court handed down Landry v. Board of Levee Commissioners of the Orleans Levee District, 477 So.2d 672 (La. 1985), in which the statute was found to be inapplicable to the area of the Lake Pontchatrain seawall because it is "a recreational area within a populated city, adjacent to a much travelled Lakeshore Drive, and within a stone's throw of an exclusive residential area" of New Orleans. 477 So.2d at 675.
We feel compelled, as did the trial judge, to follow these decisions of the Supreme Court on the issue of immunity. Clearly, Audubon Park is not the sort of undeveloped, rural or semi-rural property described in Keelen. It is, however, a recreational area within a populated city and adjacent to a residential neighborhood, as was the area contemplated in Landry.
We recognize, as the defendants have pointed out, that despite the Keelen and Landry decisions, our brethren on the First Circuit have recently applied 9:2795 in two instances to areas of municipal parks. See Van Pelt v. Morgan City Power Boat Association, 489 So.2d 1346 (La.App. 1st Cir.1986), and Stuart v. City of Morgan City, 504 So.2d 934 (La.App. 1st Cir.1987). However, both of these cases involved accidents in lakes, which were specifically mentioned in Keelen as areas to which the immunity statute was intended to apply. Keelen, supra, 463 So.2d at 1291. Additionally, the Supreme court has granted writs to review the Van Pelt decision (493 So.2d 627) and has not yet handed down its opinion. Under the circumstances, therefore, we agree with the trial court that R.S. 9:2795 does not apply to this case.
II. Liability
Louisiana courts employ a duty/risk analysis to determine what constitutes actionable negligence in a tort suit. See, e.g.: Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984); Shelton v. Aetna Casualty & Surety Co., 334 So.2d 406 (La. 1976). In order to recover, plaintiff must show not only that the defendant's conduct was a cause-in-fact of the harm suffered, but also that the defendant breached a legal duty to protect against the particular risk involved. Harris v. Pizza Hut of Louisiana, Inc., supra, 455 So.2d at 1370. Duty is a question of law. Id. at 1371.
In the instant case, the trial court concluded that the Audubon Park Commission had a legal duty to protect or warn its patrons against the type of violent attack suffered by plaintiff Sutter in Shelter No. 12 on the afternoon of October 3rd, 1981. We disagree with this conclusion.
*1231 In general, owners and occupiers of land have a duty to refrain from acting negligently toward those they know or should know will come onto their property. The proper test is "... whether in the management of his property he has acted as a reasonable man in view of the probability of injury to others...." Cates v. Beauregard, 328 So.2d 367 (La.1976); Shelton v. Aetna, supra; Barcia v. Estate of Keil, 413 So.2d 241 (La.App. 4th Cir.1982). The duty is not to insure against the possibility of an accident, but to act reasonably. Id. at 243. Thus, the landowner has a duty to discover any unreasonably dangerous conditions on the premises and to either correct the conditions or warn of the danger. Shelton v. Aetna, supra, 334 So.2d at 410. A governmental agency or municipality operating a public park or playground is held to the same degree of care arising from ownership as any other person in possession and control of land; this rule requires that the agency or municipality use reasonable or ordinary care to keep the premises in reasonably safe condition for those using them. Godfrey v. Baton Rouge Recreation and Parks Commission, 213 So.2d 109 (La.App. 1st Cir.1968).
The threshold issue in determining the Commission's liability, then, is whether this duty to maintain the park in a reasonably safe condition includes the duty to provide special protection against the type of criminal assault suffered by Mr. Sutter in Shelter No. 12. This issue is res nova; we have been cited no other Louisiana decisions involving the liability of a park or playground operator for third-party criminal conduct. Plaintiff relies heavily on several decisions holding that a business proprietor is liable for damages to his patrons caused by criminal activity on his premises when such activity is foreseeablethat is when the proprietor knows or should know of the potential danger from such activity. See, e.g.: Ballew v. Southland Corp., 482 So.2d 890 (La.App. 2d Cir.1986); Pennington v. Church's Fried Chicken, Inc., 393 So.2d 360 (La.App. 1st Cir.1980); Phillips v. Equitable Life Assurance Co., 413 So.2d 696 (La.App. 4th Cir.1982), writ denied, 420 So.2d 164 (La.1982); Day v. Castilow, 407 So.2d 510 (La.App. 4th Cir.1981); Jones v. Kwik Karol and Ginalco, Inc., 490 So. 2d 664 (La.App. 2d Cir.1986). This reliance is somewhat misplaced because the operator of a public park does not necessarily have the same duty with regard to thirdparty criminal conduct as does the proprietor of a business. The duty owed by an owner or occupier of land must be ascertained by examining the particular facts. Shelton v. Aetna, supra, 334 So.2d at 410; Lear v. United States Fire Ins. Co., 392 So.2d 786, 788 (La.App. 3d Cir.1980). An innkeeper, for example, owes his guests a higher duty of care in deterring criminal assault than does an ordinary business proprietor. Ballew v. Southland Corp., supra, 482 So.2d at 893 n. 1. In the same vein, the operator of a large, open public park may owe a lesser duty to protect against criminal activity than would the proprietor of a business, which is conducted in a confined space and from which the proprietor derives revenue. Conversely, in an area of the park such as the zoo, a confined space to which admission is charged, the duty of the park operator might well be analogous to that of an ordinary business proprietor.
Using the standard of the reasonable man, we must determine whether, under the circumstances of the instant case, the threat of criminal assault at Shelter No. 12 constituted an unreasonable danger to park patrons such that the Commission had a legal duty to take protective measures against it.
A. An Unreasonable Danger?
The trial court found that Shelter No. 12 presented a foreseeable danger to Mr. Sutter against which the Commission had a duty to protect or warn. Considering the evidence produced at trial, we find this conclusion to be manifestly erroneous.
The plaintiff presented three basic categories of evidence in his attempt to prove that Shelter No. 12 constituted an unreasonable danger: (1) Evidence concerning the location and characteristics of the shelter itself; (2) Evidence concerning crime in the park in general; and (3) Evidence concerning *1232 known homosexual activity at Shelter No. 12.
Regarding the characteristics of the shelter, plaintiff presented Dr. William Thornton, an expert in criminology, who testified that Shelter No. 12 posed an "opportunistic target" for criminals because of certain physical features. These features included the fact that Shelter No. 12 is located about 50 feet from Walnut Street and about 150 feet from the interior park road; that there is a paved walkway leading from the shelter to Walnut Street; and that the door to the shelter is at right angles to both Walnut Street and the park road. Dr. Thornton suggested that a park restroom should not be more than 50 feet from "natural surveillance." He said that he got this idea from a scholarly article on the subject, which publication was not introduced into evidence. Neither was it shown that Shelter No. 12 could not be seen from the park road.
As for the door, it was never suggested that a person entering or leaving the shelter could not be seen from the park road, but only that one on the road could not see inside the restroom, which is consistent with the privacy normally afforded by such a facility. Dr. Thornton also suggested that there should have been a barrier, such as a fence, between the shelter and Walnut Street. There was no evidence, however, that Mr. Sutter's assailant came from Walnut Street rather than from some other area of the park, which is open on all sides.
Mr. Raymond Pendleton, an expert in private security, testified that the distinct features of Shelter No. 12 (the same ones cited by Thornton) were "security weaknesses." Nevertheless, it was not shown that the construction of Shelter No. 12 violated any building code, safety code, or other objective standard; nor was there any evidence that the Commission had knowledge of the so-called "security weaknesses" inherent in the shelter's design. The only evidence relating to the foreseeability of crime was that there was literature available to the security staff and Commission members concerning crime in public restrooms and how those restrooms could be made more safe by altering the physical environment.
The second category of testimony dealt with the prior incidence of crime in the park and particularly at or near Shelter No. 12. Mr. Aaron Bowers, who worked as a security guard at the park from 1973 until 1984, testified that both Shelter No. 11 and Shelter No. 12 had reputations as places where homosexuals gathered. He also stated that he knew of five violent crimes in the park which he had turned over to the city police during the ten years he worked, including three robberies in 1972-1975 and two other violent crimes which occurred sometime prior to June of 1981. All of these crimes occurred at night and none occurred at a Shelter.
The second witness who testified concerning crime was Mr. Dale Stastney, who served as Operations Manager of the park in 1981. At that time, the Director of Security reported to Mr. Stastney. Mr. Stastney stated that he didn't feel that there was a problem with violent crime at Shelter No. 12, but only with homosexual activity. Mr. Earl Simmons, who was the Director of Security in 1980-1981, concurred with this viewpoint.
Plaintiff's final two witnesses on the subject of crime were the aforementioned experts, Dr. Thornton and Mr. Pendleton. Dr. Thornton used statistics from the New Orleans Police Department (NOPD) to analyze the crimes that occurred in the park area in 1980 and 1981, which he plotted on a chart using a dot to represent each crime. According to this chart, there were four crimes in the park itself in 1981 prior to Mr. Sutter's shooting, none in the immediate vicinity of Shelter No. 12. He admitted that it was not possible to tell exactly where each crime occurred, because the statistics he used reflected only the places from which the crimes were reported. Neither did he know the nature of all the individual crimes because he had not consulted the incident reports. Of the four crimes in 1981, however, he testified that two were robberies, one was a rape and one was an attempted rape. The actual incident reports, introduced by defendants, *1233 showed that the only violent crime in the front part of the park between January and October of 1981 was an armed robbery on March 21st.
Based on the NOPD statistics and the characteristics of Shelter No. 12, Dr. Thornton opined that there was a "very high probability" that violent crime would occur in Shelter No. 12. Similarly, Mr. Pendleton stated that the increase in overall crimes and crimes against persons from 1979 to 1981, combined with the high usage of the park and the relatively low level of security, increased the risk of crime to park patrons and made Mr. Sutter's attack reasonably foreseeable.
The third category of evidence presented by plaintiff in his attempt to show foreseeable danger at Shelter No. 12 was testimony concerning homosexual activity at the shelter. Mr. Bowers, Mr. Stastney and Mr. Simmons all testified that they were aware of homosexual activity going on at Shelter No. 12 for years prior to Mr. Sutter's shooting. The preponderance of the evidence clearly showed that this activity was occurring primarily at night, not during the day. Mr. Stastney stated that he had received complaints from neighbors that homosexuals were using the park shelters for these activities around sundown and after dark, and again right before sunrise and at sunrise. There had also been vandalism of the doors and other property in the shelters. Therefore, in January of 1981, the Commission installed iron gates on the doors and bars on the windows of Shelter No. 11. In June of 1981, the same type gates and bars were put on Shelter No. 12. After that time, the shelters were locked each night and reopened in the morning. The final evidence on the subject of homosexual activity was Mr. Pendleton's expert opinion that such activity often attracts violent crimes, such as robberies and muggings. There was no evidence that any of the park personnel knew of this relationship between homosexuality and other types of crime.
Considering the totality of the evidence, we find no basis upon which to conclude that Shelter No. 12 presented an unreasonable danger to park patrons. We do not find any significant history of violent crime in or around Shelter No. 12 such that the park Commission would have a duty to provide special security or to warn its patrons. Mr. Sutter's assault occurred on a sunny Saturday afternoon when there were at least fifty people lounging and picnicking in the area around Shelter No. 12. Under the circumstances, we do not find that the mainly nighttime homosexual activity at the shelter made it predictable that a violent daytime assault would occur there. Finally, we are not impressed by the testimony that the shelter itself, merely because of its location and physical design, presented an unreasonable risk to park patrons. All of these factors taken together did not make the shelter unreasonably dangerous to its users. Therefore, we find the trial judge's conclusion that "the risk of crime on the premises was sufficiently foreseeable to require special protection" to be manifestly erroneous.
In reaching this conclusion, we do not discount the mass of evidence presented by the plaintiff which showed that the security staff at Audubon Park was both untrained and unqualified to deal with violent crime. Under the facts of this case, however, we do not find that the risk of criminal assault at Shelter No. 12 was sufficient to impose a duty upon the park Commission to employ a mounted or foot patrol, place a permanent guard in the area, or alternatively, to tear down or relocate the shelter. Mr. Sutter's shooting was a random, unforeseeable criminal attack which could not have been easily prevented. Because we find that the Commission had no legal duty to anticipate such an attack, the fact that the park security may have been inadequate for other purposes is irrelevant.
B. Assumption of Duty
The trial court found that the Commission had a duty to protect Mr. Sutter not only because his attack was foreseeable, but also because the Commission had assumed such a duty under the principles enunciated in Harris v. Pizza Hut, supra. *1234 In Harris, two customers of a Pizza Hut restaurant were shot by an armed robber who had entered the restaurant while the special armed security guard hired to protect it was sitting down eating. In that case, the Supreme Court said:
Generally, there is no duty to protect others from the criminal activities of third persons. Restatement of Torts Second, § 314 (1965); Prosser, Law of Torts, § 33 at pp. 173-74 (4th Edition, 1971). However, when a duty to protect others against such criminal misconduct had been assumed, liability may be created by a negligent breach of that duty. Restatement of Torts Second, § 324A; Prosser, supra, pp. 174-176....
. . . . .
The circumstances establish that this armed robbery was forseeable and more than a mere possibility. The guard was there to prevent financial loss to the restaurant, assure the patrons that the premises were safe, and otherwise create what turned out to be an illusory impression of security. It is unnecessary to decide how many prior criminal acts create a duty to hire a private guard because the Pizza Hut had recognized that the risk of crime on these premises was sufficiently foreseeable to require special protection. Whether this Pizza Hut has a duty to hire security guards is irrelevant. There was a security guard. Since the Pizza Hut was furnishing security through the services of a trained police officer, the question is whether the security guard breached his duty by adequate measures to protect those on the premises. Thus, the question is not whether the Pizza Hut was required to have a security guard on the premises, but whether its security guard breached the applicable standard of care.
Id. 455 So.2d at 1371-1372 (footnotes omitted.)
The trial judge's reliance on the Pizza Hut decision to conclude that the Audubon Park Commission assumed the duty of protecting Mr. Sutter is clearly wrong. The facts of Pizza Hut are completely different from those of the instant case in several key ways. Because of prior nightime robberies at the restaurant (more than twenty), the Pizza Hut proprietor had hired an armed, off-duty police officer to work as a security guard between the hours of 9:00 p.m. and 1:00 a.m. The management had therefore "recognized that the risk of crime on these premises was sufficiently foreseeable to require special protection." Id. 455 So.2d at 1371. We cannot say, however, that Audubon Park, merely because it had a security staff, recognized that the risk of crime at Shelter No. 12 was sufficient to require special protection.
The Audubon Park security force during the daytime shift normally consisted of five people, four who worked in the zoo and one who continuously patrolled the remaining open expanse of the park in an unmarked yellow station wagon with a roof light. This park patrol was uniformed but unarmed. They carried radios which would put them in touch with a base station in the park. Their stated purpose, as set forth in the security manual, was to assist and provide information to park visitors, enforce park regulations and protect park property and visitors. A four hundred acre park is not comparable to a Pizza Hut restaurant. If the park had had a security guard stationed in the vicinity of the shelter at the time of the shooting who had acted negligently, it might be proper to hold that the park had breached an assumed duty. However, it is inconceivable to suggest that merely because the park had a security patrol, it assumed the duty of protecting against the type of violent restroom assault experienced by Mr. Sutter. Such a holding would make the operator of any public park with any type of security force a virtual insurer against random criminal attacks perpetrated on park visitors. We will not extend the Pizza Hut rationale so far. The Audubon Park Commission did not assume the duty of protecting against this assault.

CONCLUSION
The Audubon Park Commission had no legal duty to provide special protection to Shelter No. 12; nor did it assume such a *1235 duty. Therefore, the Commission is not liable for plaintiff's injuries. In view of this holding, we do not reach the issues of breach of duty or amount of damages.
Accordingly, we reverse the judgment of the trial court and render judgment in favor of the defendants, the Audubon Park Commission and Southeastern Fidelity Insurance Company, and against the plaintiff, Malcolm Sutter, II, dismissing his suit at his cost.
REVERSED.