hMAX N. TOBIAS, JR., Judge.
The plaintiffs, Kathleen and Benjamin Waring, individually and as administrators of the estates of their minor children, Eleanor and Nina Waring, appeal from the summary judgments entered in favor of the defendants, the State of Louisiana through the New Orleans City Park Improvement Association (hereinafter, “the State”)[1] and former Orleans Parish Criminal Sheriff Charles C. Foti, Jr. (hereinafter, “the Sheriff’). After reviewing the record and applicable law, we affirm the trial court.
This case arises out of an accident that occurred on 10 June 1999 at the riding stables located in New Orleans City Park and operated by the New Orleans City Park Riding Stables, Inc. (hereinafter, “the Stables” or “the lessee”), a corporate entity in which the State had no ownership interest. The Stables leased the physical facilities from the New Orleans City Park Improvement Association for its business. The leased facilities included barns, fenced areas for riding plessons, boarding facilities, and ancillary structures (collectively “the leased premises”).
The Stables offered a number of services in the course of its business, including a summer riding camp that taught children to ride and care for horses. Each camp ran for five days. The accident in question occurred at the riding camp during the five-day period between 7 June and 11 June 1999. Mrs. Waring had enrolled her daughter, Eleanor (hereinafter, “Ellie”), as a participant in the camp. On 10 *122 June, at the conclusion of the fourth day of camp, while walking to the parking lot in front of the stables, Ellie was kicked in the head by a horse named “Ghost of Gish” (hereinafter, “Gish” or “the horse”), sustaining severe and permanent injuries. The horse, owned by defendants, Mary and Lawrence Antonini, was being boarded at the Stables. At the time of the incident, Gish was handled by the Stables’ employee, Ernest Thomas (hereinafter, “Thomas”), who cautioned Ellie and other campers to stay away from the horse.
On the date in question, Thomas was an inmate sentenced to the legal custody of the Louisiana Department of Corrections, but in the physical- custody of the Sheriff. Thomas was participating in a work release program authorized by La. R.S. 15:711, which allows eligible inmates to work for private employers. While his compensation was paid by the Stables, the Sheriff administered his wages for him and made certain deductions as required by La. R.S. 15:711 E.
A civil suit was filed by the plaintiffs against the State, the Stables and its insurer, the Antoninis and their insurer, and the Sheriff. The plaintiffs eventually J^settled with the insurers of the stables and the Antoninis, for a total amount of $2,000,000.00.
The State and the- Sheriff each filed motions for summary judgment. The State’s motion was based primarily on the Equine Immunity Statute, La. R.S. 9:2795.1, which provides immunity for certain persons providing equine activities. The basis of the Sheriffs motion was he was not vicariously liable for Thomas’ negligence, if any, because he was not Thomas’ employer. The Sheriff further argued that he was not independently liable for Thomas’ acts because the decision to allow Thomas into the work release program was authorized by La. R.S. 15:711.
The motions were heard by the trial court on 24 March 2004 and judgment in favor of the State and the Sheriff was rendered two days later. In its detailed judgment, the trial court found that Thomas was employed by the Stables and not the Sheriff, as evidenced by the work release contract, employment logs maintained by the Stables, and the uncontra-dicted testimony that Thomas was under the sole control of the Stables during working hours. The trial court further found that the Sheriff had complied with all the rules and regulations for Thomas’ admission into the work release program pursuant to La. R.S. 15:711.
As for the State, the trial court found that it was immune from liability:
The court’s complete reading of the Louisiana Equine Immunity Statute leads it to conclude that the statute was intended to provide immunity to individuals and businesses that supplied horses and equine related services and facilities such as, but not limited to, stables. It logically follows that the immunity provided by the [4Act was intended to apply specifically to entities whose connection to the equine activity included their/its ownership or control of the land or facility at which the equine activity occurred, even if that land or the facility had been leased to a third party.
Accordingly, this court interprets the “any other person” phrase in Equine Immunity Law to include the State. This interpretation is further buttressed by the statute’s subsequent reference to “any other person” who “owns, leases, rents, or is otherwise in lawful possession and control of the land or facility upon which the participant sustained the injuries because of a dangerous latent conditions [sic].” The State clearly owns and leases the land where plaintiff sustained her injuries. These injuries *123 where caused by a horse and not the result of any dangerous latent condition on the land.
For similar reasons, the court concludes that the State is exempt from liability under La. C.C. 2315 for the alleged “operational negligence” of its lessee, City Park Stables, Inc. Since the court has determined that the State is immune from liability under the Equine Immunity law as “any other person,” the purpose of this law is to exempt such “other person” from negligence under La. C.C. art. 2315 for tortious activities involving equine activities. Assuming arguendo, the State could be held liable for operational negligence, the court would still find such conduct exempted under the statute and the facts of this case. [Footnotes omitted.]
The plaintiffs have appealed from the judgments entered against them. We review summary judgments de novo.

The Sheriff’s Liability

We first address the question of whether the Sheriff is vicariously liable for Thomas’ acts and omissions. While this is an issue of law, it is necessary to review the facts to determine if there are genuine issues of material facts present herein.[2]
| sGish was a privately owned horse that was boarded by her owner, Mary Antonini, with the Stables. The uncontroverted testimony in the record is that Gish was a sweet and calm horse that was used to young children. She had no history of aggressiveness or violent behavior. Due to a medical condition with one of her hoofs, Gish was confined to her stall and had been so for about four months before the accident. Mrs. Antonini stated that the horse’s personality did not change due to being stall bound, as sometimes occurs. There was a sign posted on the outside of Gish’s stall stating that she was not to be removed from the stall.
Thomas was convicted on two separate occasions for distribution of cocaine, a Schedule II controlled substance. The first time he was given probation and received a jail sentence for his second offense. While incarcerated, Thomas worked with the Sheriffs department taking care of their horses for about six months, which were boarded in New Orleans City Park. He would clean the stalls and feed and water the horses. He then enrolled in the work release program, a voluntary program that would get him out of his cell and allow him to make money that he would receive upon his release.[3] Thomas was hired to work for the Stables, performing tasks similar to those done for the Sheriffs department. The Stables paid him an hourly wage, but his wages were first given to the Sheriff so that administrative fees could be deducted. The remainder of the money was placed in his inmate account. Upon his release from jail, Thomas received a check representing the money he had accumulated in his inmate account.
1 fiThomas remembered Gish and that she had a calm temperament. He knew that *124 Gish had a hoof condition and while confined to her stall, he could not recall any problems with her. Usually he spot cleaned the stall with Gish in it.
Thomas could not remember exactly how long he had been working for the Stables when the accident occurred. When he got to her stall, he decided to remove Gish because he could clean it faster; he was completely cleaning the stall out and not merely performing a spot cleaning. Thomas remembered a sign on the stall door, but thought it:said Gish could not be “turned out,” or placed in the corral for exercise. He saw no harm in taking her just a few steps outside the stall to clean it. He removed Gish and cross-tied her outside the stall in the walkway.
Thomas was in the process of removing shavings and droppings from the stall when he heard the- children coming from the back of the stables after riding camp. Because Gish was blocking the walkway, he moved her out into the open - grassy area next to the stalls to permit the children to pass. Once they had cleared the way, he was going to put Gish back by the stall and finish his work.
When the children were about twenty feet away, a group of six or seven little girls began to run towards the horse. The girls gathered around the horse and asked if they could feed Gish. Thomas warned them at least once not to go behind the horse; however, a couple of the girls proceeded. to run behind Gish. Thomas saw one of the girls slap the horse on the hindquarters and Gish responded with a kick.
The plaintiffs contend that the trial court erred in failing to find that Thomas was an employee of the Sheriff, as well as the Stables, thereby rendering the Sheriff vicariously liable for Thomas’ negligence. In addition, they contend that the Sheriff is independently liable for breaching his duty of care in properly 17administering the work release program because Thomas had been charged with an act of violence that disqualified him for the program.
The key elements in an employer-employee relationship include the right of control or supervision, the selection and engagement of the workers, the payment of wages, and the power of dismissal. Savoie v. Fireman’s Fund Insurance Co., 347 So.2d 188 (La.1977); Remet v. Martin, 97-0895 (La.App. 4 Cir. 12/10/97), 705 So.2d 1132. The record does not support the finding of an employer-employee relationship between the Sheriff and Thomas.
Thomas testified that all his instructions while at work,came from the Stables personnel, not the Sheriffs deputies. While he may have been chosen by the Sheriff to work at the Stables, he was controlled by the Stables while on the job. The Stables wage log showed that the Stables hired Thomas, which was then responsible for setting his work hours and paying his wages. Although Thomas was initially trained to work with horses by the Sheriffs office, he received additional training and instructions from the Stables and was treated like any other employee while on the job.
We agree with the trial court that none of the factors necessary to find an employment relationship between Thomas and the Sheriff are present. In addition, even if established, no evidence exists in the record that Thomas was negligent in his handling of Gish on the day of the accident. Finally, even if negligence were found, Thomas was an employee of the Stables and it was vicariously liable for his actions taken while on the job.
We next turn to the plaintiffs’ allegation that the Sheriff breached his duty of care in administering the work release program pursuant to La. R.S. 15:711. In *125 support, the plaintiffs point to the testimony of Sergeant Eric Donnelly of the IsSheriffs office indicating that certain parts of the program were not carried out properly. The evidence establishes that Thomas was accused of domestic abuse in a 1997 domestic proceeding, a fact that may have disqualified him for the program. In addition, Sergeant Donnelly stated that he was not aware of the presence of children at the New Orleans City Park stables.
In Fowler v. Roberts, 556 So.2d 1, 4-5 (La.1990), the Supreme Court stated:
The determination of liability in a negligence case usually requires proof of five separate elements: (1) proof that the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) proof that the defendant’s conduct failed to conform to the appropriate standard (the breach element); (3) proof that the defendant’s substandard conduct was a cause-in-fact of the plaintiffs injuries (the cause-in-fact element); (4) proof that the defendant’s substandard conduct was a legal cause of the plaintiffs injuries (the scope of liability or scope of protection element); and (5) proof of actual damages (the damages element). The first element is usually a judge question, and the other four are usually jury questions unless reasonable minds could not differ. D. Robertson, W. Powers, Jr. & D. Anderson, Cases and Materials on Torts 83-84 (1989).
We do not find that the plaintiffs have proven the elements necessary to hold the Sheriff independently liable for the harm suffered by the plaintiffs. While the Sheriff has a duty to properly administer the work release program, any breach of that duty was not the cause-in-fact of Elbe’s injuries. Consequently, we find no merit in the plaintiffs’ assignments of error against the Sheriff and affirm the summary judgment entered in his favor.
Is The State’s liability
The plaintiffs’ second assignment of error concerns the trial court’s dismissal of the State based on the Equine Immunity Statute, La. R.S. 9:2795.1. The plaintiffs contend that the facts of this case do not fall within the ambit of the statute. Because this court finds that the State did not owe a duty to the plaintiffs, it does not reach a discussion of the statute.
New Orleans City Park covers approximately 1,500 acres of land, and is the fifth largest urban park in America. Under Acts 1896, No. 130, § 3, it is provided that the duty of the New Orleans City Park Improvement Association “shall be to take charge and supervision of city park, and its preservation for public recreation, to its gradual improvement and ornamentation as a place of resort and pleasure for the citizens of New Orleans.”
Acts 1958, No. 492 authorized the New Orleans City Park Improvement Association to control all activities in the parks under its management; to contract with private individuals; and to charge rental and/or activity fees for use of the park property. In this regard, the New Orleans City Park Improvement Association leases land to the Stables, Christian Brothers School, the Pan American Stadium, and a couple of concession stands.[4]
The Stables, as a corporate entity, leased the riding facilities and agreed to certain duties as set forth in Section XIII, paragraph “a” of the lease:
*126 During the Lease Term Tenant, at its expense, shall maintain in good order and repair the Leased Premises, and all building and improvements thereon, including necessary replacements of all improvements initially or thereafter placed on the Leased Premises, | ^including, without limitation, the roof, the entire front entrance and all portions of the interior and exterior of the Leased Premises and appurtenances, including, without limitation, walls, structural components, floor structures, electrical and plumbing facilities, lines and fixtures, utility installations, doors and windows, stalls and paddock areas, and all heating, air conditioning and other equipment.
The Stables also agreed in the lease to assume the full responsibility for the leased premises and that it would defend, protect, hold harmless, and indemnify its lessor (i.e., the State) from any action arising directly or indirectly out of any occurrence on or about the leased premises, or out of the Stables’ operations on the premises. Further, the Stables agreed that the New Orleans City Park Improvement Association (and, i.e., the State) would “not be liable for any damage to property or persons caused by, or arising out of (a) any defect in, or the maintenance or use of the Leased Premises.... ”
Gish, the horse in question, was privately owned and was in the joint care, custody, and control of its owner, Mrs. Antonini, and the Stables pursuant to a boarding agreement (contract) between them. It is undisputed that the State was not a party to that boarding agreement.
Louisiana courts employ a duty-risk analysis to determine what constitutes actionable negligence in a tort suit against a public body. Sutter v. Audubon Park Comm’n, 533 So.2d 1226, 1230 (La.App. 4 Cir.1988); McGuire v. New Orleans City Park Improvement Ass’n, 2002-1401 (La.1/14/03), 835 So.2d 416. In McGuire, the Court stated:
Under the duty-risk analysis, the plaintiff must satisfy the following requisites to prove negligence; the plaintiff must prove that: 1) the conduct in question was a cause-in-fact of the resulting harm, 2) the defendant owed a duty of care to the plaintiff, 3) the defendant breached that requisite duty and 4) the risk of harm was |nwithin the scope of protection afforded by the duty breached. Pitre v. Louisiana Tech University, 95-1466 (La.5/10/96); 673 So.2d 585. If the plaintiff fails to prove any one of the elements, the defendant is not liable. Id. This Court is obligated to decide whether City Park presented an unreasonable risk of harm to non-golfers based upon the facts of this case. Determining whether a risk is unreasonable requires a “balance of the intended benefit of the thing with its potential for harm and the cost of prevention.” Id. citing Socorro v. City of New Orleans, 579 So.2d 931, 939 (La.1991). Also, in determining negligence, we must consider the “obviousness” and the “apparentness” of the complained of condition. Id. If the facts demonstrate that the complained of condition was obvious to all, the condition is not unreasonably dangerous and the defendant owes no duty to the plaintiff. Id.
Id. at pp. 6-7, 835 So.2d at 421.
In Sutter, supra, this court stated:
In general, owners and occupiers of land have a duty to refrain from acting negligently toward those they know or should know will come onto their property. The proper test is “... whether in the management of his property he has acted as a reasonable man in view of the probability of injury to others.... ” Cates v. Beauregard, 328 So.2d 367 (La. *127 1976); Shelton v. Aetna, supra; Barcia v. Estate of Keil, 413 So.2d 241 (La.App. 4th Cir.1982). The duty is not to insure against the possibility of an accident, but to act reasonably. Id. at 243. Thus, the landowner has a duty to discover any unreasonably dangerous conditions on the premises and to either correct the conditions or warn of the danger. Shelton v. Aetna, supra, 334 So.2d at 410. A governmental agency or municipality operating a public park or playground is held to the same degree of care arising from ownership as any other person in possession and control of land; this rule requires that the agency or municipality use reasonable or ordinary care to keep the premises in reasonably safe condition for those using them. Godfrey v. Baton Rouge Recreation and Parks Commission, 213 So.2d 109 (La.App. 1st Cir.1968).
Id. at 1231; Dussouy v. City of Kenner, 97-1254 (La.App. 5 Cir. 4/28/98), 710 So.2d 1200.
|12We are also cognizant of La. R.S. 9:3221, which addresses the assumption of responsibility by the lessee of property:
The owner of premises leased under a contract whereby the lessee assumes responsibility for their condition is not liable for injury caused by any defect therein to the lessee or anyone on the premises who derives his right to be thereon from the lessee, unless the owner knew or should have known of the defect or had received notice thereof and failed to remedy it within a reasonable time.[5]
In arguing that the Park is liable for the injury to Ellie, the plaintiffs point to a 15 July 1996 memorandum to Jamie Avila, then-director of human resources of the board of commissioners of the New Orleans City Park Improvement Association, from Merlin Haydel, safety coordinator, regarding his inspection of operation by the Stables on 9 July 1996. That memorandum states in pertinent part:
As per your request, on July 9,1996,1 inspected City Park Riding Stables, Inc. and found numerous conditions on this property that need attention. These conditions consist of several Fire Prevention and Safety items, structural maintenance, hygiene and housekeeping items.
* * *
Stable Area
4. There were at least seven fire extinguishers in various locations that were in discharged state (needing to be recharged or replaced). Useless if a fire erupts.
5. None of the fire extinguishers on the property have been inspected since early March-May 1994. Fire extinguishers should be inspected annually.
1136. Flammable liquid containers were stored within three feet of an ignition source (electric clothes dryer).
7. One extinguisher was made accessible by plastic sheeting over the wall where it was mounted. Reason unknown.
8. At lease one fire extinguisher was missing from the bracket and location.
9. In addition to the office stairs and floor mentioned in item # 1, *128 there are several stalls that need to be repaired (walls, gates, locking mechanisms and supporting posts or walls reinforced). Horses are getting out, one according to Kim-Office Manager, and one during my inspection. (Horses could trample or knock down patrons or others).
* * *
My recommendations would be:
* * *
8. Perform regular maintenance of the buildings and other structures, i.e. clean entire complex, repair damaged stairs, walls, floors, latches, doors, lights, stalls, fences, ceilings, and other structures the public has access to.
* * *
10. Thoroughly investigate whether NOCPIA has any liability exposure with respect to CPRSI. If any exists, ensure that all repairs and corrective actions re taken by CPRSI or consider making said corrections and billing them to CPRSI to protect NOCPIA interests.
[Emphasis added.]
The plaintiffs contend that this memorandum establishes actual knowledge on the part of the State that the Stables could not be trusted with safety issues. They claim that the magnitude of safety violations identified in the Haydel memorandum indicated a pervasive lack of ability or desire on the part of the Stables to do what was needed to run a proper stables. Despite this knowledge, the 114plaintiffs argue that the New Orleans City Park Improvement Association (i.e., the State) took no action to remedy the safety violations described in the memorandum.
However, the record also reflects that the operation by the Stables was again inspected in 1999. As recorded in the minutes of the 27 April 1999 meeting of the boards of commissioners of the New Orleans City Park Improvement Association, the condition of the operation of the stables by the Stables were again discussed:
HORSE STABLES — Mr. Hunn reported that the stables appeared to be in very good condition except that there is no lateral bracing in the structure and some of the columns have rusted at the base. He said that renovations are needed. Nevertheless, Mr. Hunn commented that the stables do look nice and the owners of the stable occupants have dressed out the stables very nicely. Mr. Hunn stated that after speaking with several people who were there riding horses, they seemed very happy and felt this was a nice facility.
[[Image here]]
He [Judge Taylor] said that he, Merlin Haydel, and Larry Rivarde went to the stables unannounced the other day and found that the children love it, the people are very active with children, but that the Show Horse world is a very narrow structured world.
Thus, less than two months before the accident, no safety concerns were noted. Thus, one can assume that the Stables did take corrective measures following the 1996 inspection. We also note that the record contains testimony from other boarders that they considered the stables and the operation by the Stables to be safe.
Even assuming for the purposes of this opinion that the State breached a non-delegable duty owed to Ellie to keep the New Orleans City Park safe in all respects, as argued by the plaintiffs, this court cannot find any evidence that the *129 failure to remedy those problems identified in the Haydel memorandum was a|1ficause-in-fact of the resulting harm to Ellie. The accident was not the result of a fire or a horse escaping from a stall. Any negligence that occurred was committed by the Stables, which has settled with the plaintiffs.[6] There was no notice to the State that such an accident could have occurred based on the inspections performed or the problems observed. Consequently, we agree with the trial court, albeit for different reasons.
Because the court finds no liability on the part of the State, it is not necessary to address the Equine Immunity Statute and whether it applies to the facts of this case.
For the reasons set forth above, we affirm the judgment of the trial court.

AFFIRMED.

LOVE, J., concurs in part and dissents in part with reasons.

. In this opinion, our reference to "the State” means the state of Louisiana operating though the New Orleans City Park Improvement Association. However, from time to time, we refer to the New Orleans City Park Improvement Association as the "entity” through which the State operated New Orleans City Park.

. A fact is material when its existence or nonexistence may be essential to the plaintiff's cause of action under the applicable theory of recovery; a fact is material if it potentially insures or precludes recovery, affects a litigant's ultimate success, or determines the outcome of the legal dispute. Smith v. Our Lady of the Lake Hosp., Inc., 93-2512, p. 27 (La.7/5/94), 639 So.2d 730, 751. A genuine issue is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, there is no need for trial on that issue and summary judgment is appropriate. Id.

. In order to be eligible for the work release program, an inmate must have six months or less to serve on his sentence and not be imprisoned for a violent crime.

. The park itself operates, inter alia, four golf courses, an amusement park, and the botanical gardens.

. While this statute may be broad enough to encompass both premises and operational liability, the plaintiffs contend that the physical conditions at the stables were such that horses could get out and trample people. This would be a defect in the premises itself and not the manner in which the Stables ran its operation.

. Such negligence would involve supervision of the children attending the riding camp, proper procedures and/or instructions for the handing of privately owned horses during camp hours, etc. These acts cannot be imputed to the Park simply by virtue of the fact that it owns the land on which the stables are located.